**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____
                            )
In re:                       ) Chapter 11
                            )
WEST MARINE, INC., _et al._,    ) Case No. 26-10794 (KBO)
                            )
                            ) (Jointly Administered)
            Debtors.       )
                            ) Re: Docket Nos. 7, 65
                            )
                            ) Obj. Deadline: 6/2/26 at 4:00 p.m.
                            ) Hearing Date: 6/11/26 at 2:00 p.m.
_____)

**OBJECTION OF CERTAIN UTILITY COMPANIES**
**TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) DETERMINING ADEQUATE ASSURANCE OF PAYMENT**
**FOR FUTURE UTILITY SERVICES, (II) PROHIBITING UTILITY PROVIDERS**
**FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES, (III)**
**APPROVING DEBTORS' PROPOSED PROCEDURES FOR RESOLVING ADEQUATE**
**ASSURANCE REQUESTS, AND (IV) GRANTING RELATED RELIEF**

Constellation NewEnergy, Inc. ("CNE"), Constellation NewEnergy – Gas Division, LLC ("CNEG"), Florida Power & Light Company ("FPL"), Georgia Power Company ("Georgia Power"), Virginia Electric and Power Company d/b/a Dominion Energy Virginia ("DEV"), Dominion Energy South Carolina, Inc. ("DESC"), The Connecticut Light & Power Company ("CL&P"), Yankee Gas Services Company ("Yankee Gas"), NStar East Electric Company ("NStar Electric"), NStar Gas Company ("NStar Gas"), Public Service Company of New Hampshire ("PSNH") (CL&P, Yankee Gas, NStar Electric, NStar Gas and PSNH collectively, "Eversource"), Ohio Edison Company ("Ohio Edison"), Jersey Central Power & Light

Company ("JCP&L"), Toledo Edison Company ("TE") and The Cleveland Electric Illuminating Company ("CEI") (collectively, the "Utilities"), hereby object to the *Debtors' Motion For Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment For Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utility Motion")(Docket No. 7), and set forth the following:

**Introduction**

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) of the Bankruptcy Code from seeking to modify the amounts of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amounts of the adequate assurance of payment acceptable to the Debtors.  This Court should not permit the Debtors to avoid the plain language and requirements of Section 366(c).

Through the Utility Motion, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $371,406.35 that supposedly reflects approximately 50% of the Debtors' estimated monthly

2

post-petition utility charges (the "Bank Account"). The Utility Services List attached as Exhibit "C" to the Utility Motion reflects the following proposed amounts to be contained in the Bank Account on behalf of the Utilities: (a) CNE – 413,538.67; (b) CNEG - $300.40; (c) FPL - $31,053.98; (d) Georgia Power - $3,515.87; (e) DEV - $4,654.09; (f) DESC - $2,958.56; (g) Eversource - $11,070.29; (h) Ohio Edison - $506.27; (i) JCP&L - $2,710.41; (j) TE - $299.86; and (k) CEI - $598.56.

This Court should reject the Debtors' proposed Bank Account because: (1) The Utilities bill the Debtors on a monthly basis and provide the Debtors with generous payment terms pursuant to applicable state law, tariffs, regulations and/or contracts, such that a supposed two-week account maintained by the Debtors is not sufficient in amount or in form to provide the Utilities with adequate assurance of payment; (2) Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account; and (3) Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities (which it should not), this Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

As discussed below, the Debtors filed the *Debtors' Motion For Entry of An Order (I) Authorizing the Debtors To Assume Consulting Agreement, (II) Authorizing Store Closing Sales At Certain Locations and Approving Related Procedures, (III) Authorizing Customary Compensation Enhancement, and (IV) Granting Related Relief* (the "Store Closing Sales Motion") (Docket No. 80) requesting the authorization and approval of store closing sales and store closings. The Store Closing Sales Motion does not include procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor store locations once a store closing sale is completed.  As such, there is no way for a Utility to know when the Debtors no longer require service at a store location where store closings have been completed. Outside of bankruptcy, applicable state law and/or tariffs require the Debtors to close accounts when they no longer require utility service.  Accordingly, the Debtors should be required to close their accounts with the Utilities on the date that the Debtors no longer require post-petition utility service or remain administratively obligated for the payment of such charges until they close the applicable account(s).

The Utilities are seeking the following cash deposits from the Debtors, which are amounts that they are authorized to obtain

4

pursuant to applicable state law or contract:  (a) CNE - $43,750 (2-month); (b) CNEG - $611 (2-month); (c) FPL - $125,821 (2-month); (d) Georgia Power - $13,130 (2-month); (e) DEV - $18,494 (2-month); (f) DESC - $16,730 (2-month); (g) CL&P - $18,815 (1.5-month); (h) Yankee Gas - $2,445 (1.5-month); (i) NStar Electric - $17,205 (2-month); (j) NStar Gas - $2,990 (2-month); (k) PSNH - $2,485 (2-month); (l) Ohio Edison - $1,298 (2-month); (m) JCP&L - $8,882 (2-month); (n) TE - $602 (2-month); and (o) CEI - $1,208 (2-month).  Based on all of the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.   On May 17, 2026 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.   The Debtors' Chapter 11 bankruptcy cases are being jointly administered.

**The Utility Motion**

3.   On the Petition Date, the Debtors filed the Utility Motion.

4.   On May 19, 2026, this Court entered the *Interim Order (I) Determining Adequate Assurance of Payment For Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Interim Utility Order")(Docket No. 65).  The Interim Utility Order set (i) an objection deadline of June 2, 2026 and (ii) the final hearing on the Utility Motion to take place on June 11, 2026 at 2:00 p.m.

5.   The Debtors claim that they pay approximately $742,812.70 each month for utility services.  Utility Motion at ¶ 7.

6.   Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Bankruptcy Code Sections 366(c)(2) and (3) by seeking Court approval for their own proposed form of adequate assurance of payment, which is the Bank Account containing $371,406.35 that supposedly reflects approximately 50% of the Debtors' estimated monthly post-petition utility charges.  Utility Motion at ¶ 11.

7.   The Debtors propose to "deposit" $371,406.35 into the

Bank Account, and refer to the monies contained in the Bank Account as the "Utility Deposit."  Utility Motion at ¶ 11. However, monies contained in an escrow account controlled by a customer of a utility such as the proposed Bank Account are not recognized by any state public utility commission as a "cash deposit" provided by a customer to a utility.  Additionally, Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated utility bank account.  Simply put, the Debtors are not proposing to provide any of their utilities with cash deposits as adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

8.    The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amounts of the security sought by the Utilities under Section 366(c)(2).

9.    The Debtors claim that they have a long and established history of consistent payment to their utility companies.  Utility Motion at ¶ 7.  However, even if true, Section 366(c)(3)(B)(ii) expressly provides that in making an

adequate assurance of payment determination, a court may not consider a debtor's timely payment of prepetition utility charges.

10.   The Debtors claim that they intend to pay undisputed post-petition charges for utility services when due in the ordinary course of business.  Utility Motion at ¶ 11.  However, Section 366(c)(1)(B) expressly provides that an administrative expense priority shall not constitute an assurance of payment. See also Section 366(c)(3)(B)(iii).

11.   The Debtors propose that monies contained in the Bank Account attributable to each utility company shall be returned to the Debtors upon the earlier of (i) payment of the relevant final post-petition bill, (ii) the closing of a sale of substantially all of the Debtors' assets, (iii) the effective date of a Chapter 11 Plan, or (iv) such other time as the Chapter 11 cases may be closed.  Utility Motion at ¶ 14.  The Utilities bill the Debtors in arrears and will likely provide post-petition utility goods/services to the Debtors through the effective date of a plan, a sale closing date or a store closing date, meaning that any monies contained in the Bank Account should not be returned to the Debtors until the Debtors confirm that they have paid in full their post-petition utility expenses owed to their utility companies.

12. The Utility Motion does not address why the Bank Account would be underfunded with supposedly two-weeks of utility charges when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contracts to bill the Debtors monthly. Moreover, the Debtors presumably want the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they received prepetition. Accordingly, if the Bank Account is relevant, which the Utilities dispute, and two-week amounts were actually contained in the Bank Account for each of the Utilities, the Debtors need to explain: (A) Why they are only proposing to deposit supposed two-week amounts into the Bank Account; and (B) How such an insufficient amount could even begin to constitute adequate assurance of payment for the Utilities' monthly bills.

13. Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2). Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business," constitutes sufficient adequate assurance of payment. Utility Motion at ¶ 14. Section

9

366(c)(1)(B) specifically provides that an administrative expense priority shall not constitute an assurance of payment.  Moreover, as numerous administratively insolvent bankruptcy cases demonstrate, a debtor's claim to have budgeted sufficient funds for the payment of post-petition expenses is not a reliable form of assurance.  *See, e.g., In re Christmas Tree Shops, LLC, et al.*, (Bankr. D. Del., Case No. 23-10576); *In re Big Lots, Inc., et al.*, (Bankr. D. Del., Case No. 24-11967); *In re Party City Holdco Inc., et al.*, (Bankr. S.D. Tex., Case No. 24-90621).

<u>**The Debtors' Cash Collateral Motion**</u>

14.  On May 18, 2026, the Debtors filed the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Use Cash Collateral, and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection To Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion") (Docket No. 13).

15.  On May 19, 2026, this Court entered the *Interim Order (I) Authorizing the Debtors To (A) Use Cash Collateral, and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection To Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV)*

*Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Cash Collateral Order")(Docket No. 71).

16.   The Interim Cash Collateral Order approved a carve-out for payments to the Debtors' professionals incurred prior to the delivery of a Carve-Out Trigger Notice, plus an additional $500,000 after delivery of a Carve-Out Trigger Notice (the "Carve-Out").   Interim Cash Collateral Order at pages 16-17.

17.   Schedule "2" to the Interim Cash Collateral Order sets for the following Adequate Assurance Milestones: (i) within 45 days of the Petition Date – entry of an Order approving the Disclosure Statement on a conditional basis; (ii) within 60 days of the Petition Date – the Debtors shall have delivered a report from each firm providing service in connection with the liquidations of the collateral commenting on sales performance, and with respect to the going-out-of-business sales of inventory; and (iii) within 80 days of the Petition Date – entry of an order confirming the Plan.

18.   Attached as Schedule "1" to the Interim Cash Collateral Order is a 13-week Approved Budget through the week ending August 14, 2026 (the "Budget").   Although the Budget includes a line-item for "Rents/Utilities," it is not apparent from the Budget whether sufficient funds have in fact been budgeted for the timely (and full) payment of the Debtors' post-

petition utility charges.

### The Debtors' Critical Vendor Motion

19.   On the Petition Date, the Debtors filed the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and HSE Suppliers, (II) Granting Administrative Expense Priority To All Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Banks To Honor and Process Checks and Transfers Related To Such Obligations, and (IV) Granting Related Relief* (the "Critical Vendor Motion")(Docket No. 11).  Through the Critical Vendor Motion, the Debtors sought authority to pay Critical Vendor Claims in an amount not to exceed $10,000,000 on an interim basis and $17,750,000 on a final basis.  Critical Vendor Motion at ¶ 9.

20.   On May 19, 2026, this Court entered the *Interim Order (I) Authorizing Debtors To Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and HSE Suppliers, (II) Granting Administrative Expense Priority To All Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Banks To Honor and Process Checks and Transfers Related To Such Obligations, and (IV) Granting Related Relief* (the "Interim Critical Vendor Order") (Docket No. 70).  The Interim Critical Vendor Order authorized the Debtors to pay

12

Critical Vendor Claims in an aggregate amount not to exceed $10,000,000 on an interim basis.  Interim Critical Vendor Order at ¶ 4.

21.   The Debtors claim in Paragraph 10 of the Utility Motion that uninterrupted utility services "are essential to the Debtors ongoing business operations and the overall success of these chapter 11 cases."  However, the Critical Vendor Motion does not reflect that the Debtors sought Court authority to pay prepetition utility charges.

### The Debtors' Store Closing Sales Motion

22.   On May 21, 2026, the Debtors filed the Store Closing Sales Motion (Docket No. 80), requesting the authorization and approval of closing sales and store closures.

23.   The Store Closing Sales Motion does not propose procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor store locations as of the end of a store closing sale or a store closing date.

### The Bid Procedures Motion

24.   On May 18, 2026, the Debtors filed the *Debtors' Motion For Entry of An Order (I)(A) Approving Bidding Procedures, (B) Authorizing the Debtors To Enter Into One or More Stalking Horse Purchase Agreements and Provide Bid Protections, (C) Scheduling*

*An Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Bid Procedures Motion")(Docket No. 49).

25. The Debtors' propose the following dates and deadlines in connection with the Bid Procedures: (i) as soon a reasonably practicable after the entry of the Bid Procedures Order – serve Cure Notice; (ii) two (2) business days after the entry of the Bid Procedures Order – serve Sale Notice; (iii) by June 26, 2026 – bid deadline; (iv) by June 29, 2026 – auction (if necessary); (v) as soon as practicable after the auction – notice of successful bidder; (vi) by June 30, 2026 – sale transaction objection deadline; (vii) by July 8, 2026 – Cure Notice objection deadline; and (viii) by July 30, 2026 – sale hearing. Bid Procedures Motion at ¶ 14.

**Facts Regarding CNE**

26. CNE provides electricity and related services to the Debtors pursuant to four Electricity Supply Agreement – Fixed Price Solutions (collectively, the "Electricity Agreements") that

14

set forth the terms and conditions concerning CNE's provision of electricity and related services to the Debtors.  CNE has continued to provide the Debtors with electricity and related services pursuant to the Electricity Agreements since the Petition Date.

27.  Pursuant to the Electricity Agreements, the Debtors receive approximately one month of electricity and related services before CNE issues a bill.  Once a bill is issued, the Debtors have approximately twenty (20) days to thirty (30) days, as applicable, after an invoice date to pay the bill. Accordingly, the Debtors could receive at least two months of electricity and related services before CNE could terminate the Electricity Agreements after a post-petition payment default.

28.  The pre-petition debt owed by the Debtors to CNE is estimated to be not less than $41,970.74.  CNE is requesting a two-month cash deposit of $43,750 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Electricity Agreements.

<strong><u>Facts Regarding CNEG</u></strong>

29.  CNEG provides natural gas and related services to the Debtors pursuant to a Gas Sales and Distribution Services Agreement (the "Gas Agreement") that sets forth the terms and

15

conditions concerning CNEG's provision of natural gas and related services to the Debtors.  CNEG has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreement since the Petition Date.

30.   Pursuant to the Gas Agreement, the Debtors receive approximately one month of natural gas and related services before CNEG issues a bill.  Once a bill is issued, the Debtors have approximately fourteen (14) days after the date of an invoice to pay the applicable bill.  Accordingly, the Debtors could receive more than two months of natural gas and related services before CNEG could terminate the Gas Agreement after a post-petition payment default.

31.   The pre-petition debt owed by the Debtors to CNEG is estimated to be not less than $333.12.  CNEG is requesting a two-month cash deposit of $611 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreement.

**Facts Regarding the Utilities Other Than CNE and CNEG**

32.   Each of the Utilities provided the Debtors with prepetition utility goods and/or services, and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

33.   Under the Utilities' billing cycles, the Debtors

16

receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

34.  To avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to their tariffs and/or state laws, regulations and/or ordinances are set forth in **Exhibit "A"** attached hereto.

35.  Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional

accounts belonging to the Debtors are subsequently identified, the Utilities' estimated prepetition debt and post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
| --- | --- | --- | --- |
| FPL | 36 | $68,315.78 | $125,821 (2-month) |
| Georgia Power | 3 | To be supplemented | $13,130 (2-month) |
| DEV | 8 | $8,900 | $18,494 (2-month) |
| DESC | 7 | $5,996.57 | $16,730 (2-month) |
| CL&P | 4 | $2,802.24 | $18,815 (1.5-month) |
| Yankee Gas | 2 | $463.21 | $2,445 (1.5-month) |
| PSNH | 2 | $1,463.44 | $2,485 (2-month) |
| NStar Electric | 9 | $5,770.30 | $17,205 (2-month) |
| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
| NStar Gas | 3 | n/a | $2,990 (2-month) |
| Ohio Edison | 3 | $529.12 | $1,298 (2-month) |
| JCP&L | 3 | $1,767.80 | $8,882 (2-month) |
| TE | 1 | $151.43 | $602 (2-month) |
| CEI | 2 | $1,030.53 | $1,208 (2-month) |

36.   FPL held prepetition deposits totaling $174,322 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the FPL post-petition deposit request.

## Discussion

**A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the Supreme Court of the United States, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)); *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within

19

thirty (30) days of the filing of the petition. *In re Lucre*, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005). If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c), and it should deny the Utility Motion as to the Utilities.

      **1.    The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section

366(c)(1)(A). Moreover, even if this Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutorily approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities. Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. It is underfunded from the outset because even if the Debtors were to place two-week amounts in the Bank Account for the Utilities, the Utilities issue monthly bills and by the time a default notice is issued, the Debtors will have received approximately 60 days of commodity or service.

3. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts.

4. The Debtors should not reduce the amount of the Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

Accordingly, this Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account: (a) Is not the **form** of adequate assurance requested by the Utilities; (b) Is not a form recognized by Section 366(c)(1)(A); and (c) Is an otherwise unreliable form of adequate assurance.

    **2. The Utility Motion Should Be Denied As To The Utilities Because The Debtors Have Not Set Forth Any Basis For Modifying The Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide this Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified.  Accordingly, this Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.   THIS COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), holding that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

22

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed."  *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month.  They then provide the Debtors with 20 to 30 days to pay the bill, the timing of which is set forth in applicable state laws, tariffs, regulations, and/or contracts.  Based on the foregoing state-mandated, or contract-mandated, billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the

Utilities still have potential exposure of approximately 60 days or more based on their billing cycles.  Furthermore, the forms and amounts of the Utilities' adequate assurance requests are the forms and amounts that the applicable public service commission, which is a neutral third-party entity, or contract, permits a Utility to request from its customers.  The Utilities are not taking the position that the cash deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but instead are introducing those forms and amounts as evidence of the forms and amounts that the applicable regulatory entity or contract permit the Utilities to request from their customers.

In contrast, the Debtors failed to address in the Utility Motion why this Court should modify, if at all, the amounts of the Utilities' adequate assurance of payment requests, which is the Debtors' statutory burden.  Instead, the Debtors merely asked this Court to approve the Bank Account supposedly containing approximately two-weeks of the Debtors' utility charges.  The Debtors did not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of the Bank Account.  Moreover, in contrast to the improper treatment proposed to the Utilities, the Debtors have made certain that supposed Critical Vendors and post-petition professionals are

24

favored creditors over the Utilities by ensuring (i) the payment of Critical Vendor Claims in an amount of up to $10,000,000 on an interim basis and $17,750,000 on a final basis, and (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of cash collateral, by obtaining a $500,000 professionals' carve-out for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default.

Additionally, the Store Closing Sales Motion does not propose procedures or requirements for the Debtors to (i) timely contact the applicable Utilities to terminate utility service to any Debtor store locations once a store closing sale is completed and the Debtors no longer require utility services at an applicable closed Debtor store, or (ii) close a post-petition account with the Utilities when the Debtors no longer require post-petition service for that account.  As such, there is no way for a Utility to know when the Debtors no longer require service at a store location where store closings have been completed.  The Debtors should be required to close accounts with the Utilities when they no longer require post-petition service for such accounts, or otherwise they should remain administratively responsible for such charges until they do close the applicable account(s).

Despite the fact that the Utilities continue to provide the Debtors with admittedly crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the risk of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to receive for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security that they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1. Denying the Utility Motion as to the Utilities;

2. Awarding the Utilities the post-petition adequate assurance of payments pursuant to Section 366 in the amount and form satisfactory to the Utilities, which is the form and amount requested herein;

3. Require the Debtors to close any account(s) with the Utilities when they no longer require post-petition service from the Utility for the account(s) or remain administratively responsible for such charges until they do close the account(s); and

26

4.      Providing such other and further relief as this Court deems just and appropriate.

Dated: May 29, 2026          WHITEFORD, TAYLOR & PRESTON, LLC

/s/ *William F. Taylor, Jr.*
William F. Taylor, Jr. (#2936)
600 North King Street, Suite 300
Wilmington, Delaware 19801
Telephone:(302) 353-4145
Facsimile:(302) 357-3270
E-mail: wtaylor@whitefordlaw.com

and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
E-mail: russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com

*Counsel for Constellation NewEnergy, Inc., Constellation NewEnergy – Gas Division, LLC, Florida Power & Light Company, Georgia Power Company, Virginia Electric and Power Company d/b/a Dominion Energy Virginia, Dominion Energy South Carolina, Inc., The Connecticut Light & Power Company, Yankee Gas Services Company, NStar East Electric Company, NStar Gas Company, Public Service Company of New Hampshire, Ohio Edison Company, Jersey Central Power & Light Company, Toledo Edison Company and The Cleveland Electric Illuminating Company*